Please David Heilbron and Bingham McCutcheon for appellant. The CHIP Act draws a clear dimensional line. The Act says that a mask represents the 3D pattern that by means of the mask work is fixed in the chip. So it is one-to-one with the chip and therefore as Altera's expert put it, every element of the chip is 3D and in the chip has to be multi-layered and therefore in 3D by statutory command 901 A1A. And Congress was very graphic about it. Senate Report 2 to 3, House Report 11 to 12 put it this way, a chip is a multi-layered sandwich, complex. It has a intricate terrain. And a last item quickly, the layout is one-to-one with that intricate 3D mask work that is one-to-one with the chip. So it is likewise 3D when all the dust is settled. Every expert agreed to that including Mr. Reed at 719 and 811 and Altera admits it to be so here at AB 7 and Congress more important understood it to be so. Congress recognized that the layout stage was long, it was arduous, costly, and in fact everyone has a party when you're finished with it. And accordingly Sotomayor, what specific ruling of the district court are you appealing, the summary judgment ruling where it held that the selection arrangement in combination of the electrical components is protectable? We are appealing that. We're appealing the instruction on reverse engineering. Well, we're appealing the result of that summary judgment ruling that Your Honor just described, having the case go to the jury and there was a JMOL as a consequence which was denied. I understand. So, so, but, but that's, that's the, the ruling that's being appealed. That and in respect to the reverse engineering instruction. You've got the instructional error. Yes. Okay. If I understand it right, that's basically what the district court said, is that the arrangement or selection of combination of the electrical components is protectable, whereas your position is that only the arrangement of transistors at the transistor level or layer is protectable. Have I said that right? Yes, although I would have this inundation to it. It's not my position. It's Congress's position. Well, okay, that's fine. But I just, I just want to understand exactly where the fight is. That's the fight. Okay. And in other words, you would say all of the architectural components in the interconnecting lines, interconnecting lines and so forth are not protected by the CHIP Act, period. The arrangement of them, the architecture of them, correct. That's what we would say. And only within the groupings, the transistors as they are arranged within the groupings is protected. Well, not just the arrangement, but the size and the shape. Yes. Size and shape and where they are. Yes. Within the groupings. And on the chip, on the chip. Well, the district court said, authentically, that everything is in the chip. Well, let's try to be real clear on what's going on here. The district court and Altera say, look, there are arrangements of large blocks functional blocks on the chip. They are in 2D. There is no doubt about that. They are on the chip in the sense that that general arrangement and the relative arrangement and placement of the groupings on the chip are on the chip. But when you look at the complicated, intricate terrain of the chip, which is what Congress had in mind and what it protected under 905, there's no similarity whatsoever. It's actually a totally different chip. Now, just one point before I get to the totally different chip part of this. Congress, knowledgeable about what we talked about, protected the 3D maskwork that the costly layout generated and the chip that that maskwork is embodied in, fixed in. That's it. Nothing else. That was the expression that Congress protected. Now, with respect to differences, there's no contest here. There really isn't. Our expert stood up there and went over it in gory detail in 3D and showed that the chips, all of them, the labs, the SRAMs, the amplifiers, the connection lines, all of them were totally different in the two chips. That's essentially undisputed, right? Yes. As long as everybody understands that, I'll just stop. Let me ask you a question. If I understand it right, the case went to trial on substantial similarity and importance of the selection, arrangement, combination of the electrical components. And you say that's error. If that's error, then what should have gone to trial? Well, frankly, they didn't put together evidence which should have put the CHIP Act claim to the jury, because, as Your Honor said, what I just said was undisputed. That is to say, at the 3D level, there is no similarity between these two chips. End game. So we have to buy into the proposition that nothing about the combination or selection or arrangement of the electrical components is protectable. In order for you to win outright, but if you won part right, and it went back for retrial on infringement. The reverse engineering defense, you mean. It went back to trial on infringement. Yes. What would be the correct instruction, to consider only the nooks and crannies at the transistor level or to consider the entire, each of the layers together with the imprint on the chip? I would say that the two alternatives that Your Honor put are the same. Essentially, and yes, that would be the instruction. The instruction would be that the map. I don't understand them to be the same, so why are they the same? Well, the nooks and crannies, the terrain of the chip is what is protected. The whole chip at that level is protected. But what is not protected is the one, two, is the 2D kind of depiction of these items on little squares and blocks. And perhaps I ought to get to that and try to clear our position up here. The court said to the jury, the layout of the mask work and the mask work laid the functional blocks out, which Altera says, the arrangement of, we copied, we set. That's wrong. Altera was talking about blocks, squares in rows. They're not drawn on any mask or mask work. You will not see them on the chip, no matter how hard you strain for it, they don't depict any of the intricate terrain that's protected or anything on the chip, much less one to one and in 3D. And in fact, they didn't even exist at the time the masks were created and the chips were. And they're just technicolor renderings of the superimposition on top of that intricate terrain of boxes. Now, if you take those after the fact drawings that are on our brief at page 21 on the left hand side, you'll see some squares, you'll see some rows. They'll say 18 labs and 10 LEs or EABs. But the boxes don't depict, they won't tell you the shape, the size, the height of anything that's supposed to be in any one of those labs or any other thing on the chip. Or even how many of whatever they are, they're supposed to be. Much less 3D and one to one. Okay, well, do you just write off all of that and look only at the bottom layer or do you look at the whole look? That's my question. You can look at a layer which will itself be in 3D, but there should be no mistake here that there's no charge that at any mask layer level, any mask work has been copied. Any mask that goes into the mask work has been copied. There is no such charge and no evidence to support it. There is, when you get to the end of the day, the mask work, which is the depiction of the entire chip, nooks and crannies. The intricate terrain of it. Together with the arrangement. Well, it will, to use their word, but to use their word, it will reflect the groupings that the architecture sets out. Because the functional blocks, which are not protected and are not in 3D, but the functional blocks are the architecture and the arrangement of them and the relative placement, to use their phrase of them, is not, pardon me, is not protected. And that's what they're talking about being protected and that's what we're saying isn't. Counselor, I'd like to ask you a question that maybe could simplify the matter for me. This is the problem of common law on just enrichment. I develop a computer chip. We're very useful. That's a great thing. Through reverse engineering. I didn't hear the last. Figure out everything I did. And it cost me a million dollars to develop that chip. And you go through reverse engineering and everything that I did, you find out about it. And then you develop a chip that's better than mine, based upon all the knowledge you obtained through your reverse engineering. Now, the law, common law, since the beginning of time says, that's unjust enrichment. Well, why wouldn't you have to pay me for what you, for my labor and expense and time and the million dollars that I took to develop my chip? Well, for openers, there's no common law claim here with respect to what Your Honor just talked about. I'm not talking about the statute. I'm talking about due process of law, that you can take somebody's product and become useful and not have to pay for it? Well, that's what Congress said. Congress said, look. I know what Congress said, and I'm going beyond what Congress said. And I'm going back to common sense. Well, I- Sometimes Congress doesn't have common sense. Well, I think common sense is good to have, Your Honor, but the fact is- Do you think there's unjust enrichment in the illustration I gave you? Do I think it is? You think there was unjust enrichment in the illustration that I gave? I don't think there was- That you should have to pay, I should have to pay you for your time and effort in developing your chip? Well, I would say that there could be a construct in some place at some time which would say yes to that question, but it's not this place in this time because the Congress' statute preempts any common law claims, and there was none here. They had Congress eliminated unjust enrichment, then, in the computer business. Well, I'm not quite sure one can say that. But one can say that what Congress said was, look, the organization of components that are embodied in a mask work, and therefore the chip, is something that the reverse engineer is, quote, from a House report at 22, which the reverse engineer competitor is, quote, free to copy. The circuitry, the logic flow, or the organization of components embodying the mask work, that engineer is free to copy. And the reason for it is, among other things, that Congress was quite concerned that this very, very energetic, and from my vantage point, unbelievable industry, moving as fast as it does, would be slowed down. And it didn't want that to happen. There had been a tradition in the industry of reverse engineering, and Congress made very clear- And for the common good, therefore, I can use your property for my benefit. Would that happen to pay for it? Well, you cannot use my car, Your Honor, but you can certainly reverse engineer in the way that I have described. And the problem with this case, as to the reverse engineering part of it, as the court knows, is that the court's instruction simply took what Congress said about the organization of components out of the statute. It's gone. And so is the right to copy, out of the statute. It's gone. And that's clear error. I'm getting a little concerned here, because I do want to save some time for that, but I would also like to address the program, the bit stream a little bit. We'll equalize the time. Go ahead and finish. Thank you very much. The program license provided that the customer may use the program, quote, for the purpose of programming logic devices that are sold by Altera. And the court ruled, as a matter of law, that program, in effect, included the bit stream, was the output of the program and not the program. And in effect, it so instructed the jury. Now, that's just wrong on the contract's face and in fact. And on its face, to start with, the contract doesn't say a word about the bit stream being limited, nothing to do with it. That's particularly striking, since the license says that the customer must destroy the program upon the termination of the license, but not the bit stream. And it also says that the customer cannot transfer the program to a third party, but it doesn't say that about the bit stream. So the court just read into the contract exactly what the contract does not say. But there's not also simply the face to look at. The facts are that the bit stream is the product of the customer's choice. It's the customer's design, his logic design, his creation as even the court put it at 387 to 8. The customer owns it. Altera has no intellectual property right in it. And the license expressly makes the customer responsible for the program's results. Now, one would think, surely a reasonable person could think that if the licensor wants to take the customer's ownership right away, and bearing in mind that he's also responsible for what he owns, it's a pretty odd thing to do. And if you don't say you're doing it, you have not intended to do it, particularly because Cisco's player, Plath swore and Clear Logic offered to prove that the custom in the industry was that the bit stream is owned by the customer. And the customer is absolutely free to use it. That's the custom. And the court's answer to that was, everything I've just talked about is utterly irrelevant. And the court rejected some seven offers of proof at tabs 30 to 40 and then directed a verdict as to what the contract meant at 768. Now, that's just startling, startling. And I submit it's absolutely wrong, because who owns the bit stream, who's responsible for it, who creates it, is directly relevant to who gets to use it. And given that both parties to the contract were in the industry, industry custom with respect to the technical meaning of the words in the contract is as a matter of law relevant under Civil Code 1644 to 45.  Kennedy. Would the bit stream have been produced without the software of Altera? The bit stream was the product of the I'm not going to be indirect promise. The bit stream is the product of the customer's choice. He chooses the design. He he effectuates the design that he wants his logic design by using the bit stream as a tool in this way. He in this case extracts from his my question was how is it produced? It's produced from the software, isn't it? No, the bit stream is produced by the software of the customer when it comes to clear logic, I misunderstood Your Honor's question. And perhaps I'm confusing both of us here. At the point of the customer, it is the customer's choices with respect to the design and the creation of it which begin the process. And he uses as a tool the bit stream to effectuate his desire to source the resources that he wants to desire, that he wants to resource. And therefore effectuate his goal. But it is not a trivial process. No one should have in mind that you just kind of punch a button and say, geez, I got a great logic idea. Let's do it. The evidence is that it's a six month to 12 month exercise for the customer who's responsible for what he is doing under the contract to achieve his goal. No, I don't want to be. I'm not sure I understood it. It's done, as I understand it, with Altera's software. It is by the customer. It is not done with Altera's software, the program, by clear logic. That's a different thing. You use the bit stream, which is the product of the software. You use the bit stream, which is the product and which we have just talked about, and extract from it the logic design that the customer wished to effect. And we do that by means of a patented program, which it was pretty great. But that's the end result. I don't want to wear out my welcome here. I do have one last point on preemption that I would like to make. The Court ruled that the use of the bit stream was in effect the use of the program. Now, that's either wrong or it's right. We say it's wrong. It's the product of it. And the claim is that the end user has the right to use that product for a use other than an Altera chip. And the wrong is that, according to the Court, the use of the program, I mean, sorry, the use of the bit stream is itself the use of the program. That was the Court's reasoning. Use of it by clear logic. Now, my point here is that there are one of two choices. Either that's wrong or it's right. If it's wrong, as we say it is, they have no claim. If it's right, then what clear logic does is an infringement. And consequently, the claim with respect to it is preempted by Federal law. They made no Federal law claim, and so they lose. The claim isn't that there is an infringement of the software. That's not the claim, is it? Well, I'd like to know that. I think that would be an interesting question to ask the other side. Do they think it would? Isn't the claim interfering with the product that's produced by using the software? The claim is that. Yes. The claim is that we interfered with that contract. That is not an infringement claim. But the law is that if it is essentially like, let me get the magic words. The equivalent of an infringement, if the claim amounts to the equivalent of an infringement, then it's preempted. Now, they say, the court said, the use of the bitstream is in effect the use of the program. If that's true, using the bitstream is an infringement of the copyright on the program. So it would be interesting to see whether Altera takes the position, whether the use of the bitstream is an infringement or whether it is not. Okay. I'll give you time for rebuttal. I appreciate your time. And we'll equalize the time. So you've got a bit over 25 minutes. Let me first address the tort issues. I know everybody likes the Maskwork Act because it's interesting and novel. But let's start with the tort claims in this case. The crux of the issue is that the Altera software is used to generate what's called place and route logic functions that are part of a bitstream that is output from the software and put into the Altera chips. So when our agreement says you may use the license programs for the sole purpose of programming logic devices manufactured by Altera, we're saying you can take the output of our program and put it into our devices. Our argument here is that there is no rational way that that language can be construed to mean you can take the output of our program and put it into a clear logic device. And none of the evidence that they presented made that a rational interpretation. Because that's true, we think there is no defense here. They mentioned ownership of the bitstream. There's no evidence in the record one way or another on that issue. Judge Ware specifically said, I'm not going to reach that issue because it's irrelevant. It doesn't matter who owns it. The specific language says in the agreement you can only use the program to program Altera devices. He also mentioned a declaration from a Mr. Plath. They submitted some materials to the judge which were rejected on numerous evidentiary grounds, and they did not appeal those. So that is not properly before the court. So I think the key issue is the specific interpretation they would like to have is expressly excluded by the language in the agreement itself. With respect to the preemption argument, the answer is quite easy. There is no case that they've cited that has found the use of software in the manner that's contemplated by this restriction is an infringement. Because it's not an equivalent right, there is no preemption in this case. The Rasmussen case in the Ninth Circuit is right on point on this issue. So is the National Rental Car case, which is an Eighth Circuit case. So those are my responses on the tort claim before moving on to the mass work. If you have any questions, please let me know. Now, with respect to the mass work claim, we've lost sight of there are two separate aspects of what we are claiming here. There are interconnection lines on a chip, and then there are structures, logic structures, that perform functions on the signals that are delivered by all those electrical wires. We presented evidence at trial that thousands, I mean, five, I guess five chips, maybe 50,000 lines were copied one by one to precise places from our chip into their chip. They've not presented anything to suggest that those are not important or material. They haven't disputed with evidence that those are substantially similar layouts. They haven't disputed that those are original layouts to Altera. They haven't disputed that those are unique layout features to Altera. They've also not disputed on appeal that there's no merger of idea and expression with respect to those layout features. In essence, we have an entire part of the case where there's no dispute whatsoever. And on that ground alone, you can affirm the judgment here. Now, the difference --- I'm not sure what it is that's not disputed that you just said. Okay, let me back up. In the layout of a semiconductor device, as we've set forth in the fact section of our briefs, there are specific structures that are made up of groupings of transistors that have to be placed in particular locations in the actual chip. That is done by a layout engineer who, through a computer program, will place it in what's called the GDS design. In other words, a computer person will enter this in and decide, I'm going to place that here. And they do so with precise mathematical geometries that are then reflected exactly in the mask work that's created. But that's not the only thing that's done in creating a mask. You've got to connect all of those thousands and thousands of structures with lines that run in particular ways and are grouped in particular ways. We presented evidence that they copied all of those interconnection lines precisely into their chips, and they copied the precise placement of the groupings of transistors. Both of those things were copied. And there's been no dispute on this appeal that the thousands of interconnection lines weren't copied. So the issue, though, is whether that is what the Act protects. Right. That's the issue. Right. And I'm getting to that next. The interconnection lines, I don't believe they've presented any argument that the Mask Act doesn't protect the wires in the chip. At best, what they've done is to say by placing a grouping of transistors in one place, that's not protected. I think they're separate questions. I don't think there's any dispute that the lines that the layout engineer draws on the chip and that are built on the chip are three-dimensional, they exist in the chip, they're real, and they're protected. Counsel, the problem that I have with your side of the case is the permanent injunction. Is the preliminary injunction? Is the permanent injunction in your favor? It appears to me that that may be wrong because the remedies of law are adequate. And to grant a permanent injunction would be contrary to the national policy of encouraging the development of the computer business. You should have to pay, probably, for the benefit that you receive from somebody else's product. But to give you a permanent injunction against them doing anything with their chip seems to me to be too severe and against public policy. I think the permanent injunction is limited. It doesn't tell them that you have to go out of business. It tells them you cannot use these features that you've infringed. You can build any other chip you want, go ahead and build it on your own, but you cannot use these features that you copied. And that's a standard remedy. You can use them if you pay for them. See, that's a remedy of law that prevents a permanent injunction. Congress contemplated that just like in copyright cases, your remedy as a copyright holder is not only monetary, but it's also injunctive relief. You are entitled to injunctive relief to prevent people from using your copyrighted materials. If I were Disney and I had a videotape that was being copied, part of my remedy is not only a monetary remedy, it's an injunctive remedy. It's not a copyright case. This is a case that uses somebody else's ideas. I understand. The Maskwork Act was stated by Congress to be interpreted by the copyright rules that are normally applied in copyright cases. The Maskwork Act is an extension of the Copyright Act. It's Chapter 9 of Title 17, which is the Copyright Act. So it is an applicable copyright standard that applies in this case. And part of that remedy is injunctive relief. Yes. No, no, no. Well, well. Are the interconnecting lines patentable or patented? It would be hard to imagine me having a claim that would recite the precise geometries of thousands and thousands of lines and thousands of structures. It's just, it's hard to fathom that that would happen, because the Maskwork Act protects the actual physical layout of all of these features. Well, that's the issue again, isn't it? Right. It is the issue. I mean, because if their logic is correct, the only thing that is protectable under the Act is the actual size configuration and arrangement of the transistors within the groupings, not beyond that, if I get their argument correctly. Yeah, I understand. And that's what the district court rejected. Right. So the district court then says, all right, the arrangement, the combination, whatever, of the electrical components and the interconnecting lines are protectable. Yes. And if the jury finds that they're important and similar, they can find infringement and then get to reverse engineering. Right. What Judge Ware said was something broader than that. He said all of the aspects. That's pretty broad. Yeah. He said all of the aspects of a maskwork are protectable if they are important and material to the maskwork itself. And we leave it to you, the jury, to decide whether it's important and whether it's substantially similar. Okay. But the transistor-level similarity, was that given to the jury? Yes. Along with everything? Okay. So you have to conclude that the jury found that that wasn't important. Is that right? The jury, you have to conclude that the jury decided that that wasn't enough to extinguish the importance of the parts that were copied. Okay. Now then, can you explain in English? Yes. Why Judge Ware was correct in saying that the arrangement and selection and combination of all the electrical components and the interconnecting lines is protective? Yes. He did so because after looking at all of the evidence, he concluded that, number one, they were not features that were required or necessary given the function. Lots of different ways you could have done that. Exactly. Many different ways you could have done that. ClearLogic raised a merger defense to argue that we had to do it this way. It's the only way it could be done. Judge Ware ruled on summary judgment that's wrong. They have not appealed that. So he looked at that and said there's many different ways you can do it. And the evidence is undisputed that those features actually exist in the mask work. They are part of what the mask work designer does. The mask work designer draws each of those lines in the mask. They position the grouping of transistors by putting, in fact, a box around it and placing it into a precise geometric position on the mask. So those repeated structures that you see when you look at a chip are there because some mask work layout designer put them there. That's why Judge Ware said this is part of the mask. We can't ignore that it's part of building a mask, and we can't say that Congress intended to exclude that from protection. What Congress appears to have intended to prohibit is piracy of the sort that existed in the early 70s, that is, going in and peeling away layers of the mask and taking a picture of it and using it verbatim. Well, Congress was concerned about that, but I don't think that's all they were concerned  All right. They said, and you'll see it in the Mathias Leahy report, that mask work holders are protected not just from wholesale copying, but from piecemeal copying. And that's why they said the rule is going to be if it's an important or material part of the mask and it is copied, we're going to say it's protected. Okay. So what you say sounds a lot like you're saying there was evidence to support this, whereas I understand clear logic to be saying there was legal error from day one, and that was in letting the combination of selection and arrangement of the electrical components and the interconnected lines aspect go to the jury. Well, I understand their argument. But you're saying that that's not legally erroneous because there was evidence to support giving it, right? Yes, exactly. All right. And I'm going to find that evidence where? In the whole trial record? In the summary judgment record? You will find that in the citations we've given in our presentation. I'd be happy to run through that, but the testimony of Mr. Reed, Mr. Turner. I know. I read it, but I mean, or I've read what I've been given, which isn't the whole thing. It's very tough to follow, I must say, because it's very chopped up and you don't have the whole thing. The best I could do for you is in the opposition to the LSI amicus brief, I have a footnote which gives you pinpoint information about why each of these features actually exists in the mask and supports the evidence that these are part of the mask and not merely ideas. Then tell me why the reverse engineering instruction isn't a misstatement of the law, because it strikes me that what he did, while it cracked his basic ruling in a way by dividing what was protectable and what was unprotectable, it prohibited any copying of protected elements. And it seems to me that that's not what the purpose is, that you can copy it and you can use it to produce an original design. The mask of 906 permits anyone to make a copy, one copy. Yes. And having made that copy. That's not what he instructed. Right. As I read it. What he told them was you can reverse engineer, you can make a copy, but you can't then copy protectable features into your own chip. See, reverse engineering is a two-step process, and in most of copyright cases. He said you could reproduce nonprotectable concepts or techniques embodied in the mask work. He did not say you could copy the organization of the components. So I read the instruction as saying that you can only copy the stuff that's not protected, instead of the whole thing. What happened in this case is there is no evidence that they made a copy of the entire mask for any purpose. So you don't even get to the 906 exception. What do you mean by that? Typically, you can reverse engineer entirely or in pieces. Sure. The reverse engineering statute permits one copy of the entire mask if you want to do that, and you need to do that to do the reverse engineering that you're planning to do. It's, in essence, the intermediate copy rule that applies in some copyright cases, where you can make the copy to make sure that you can do the reverse engineering. Here, they did not make an entire copy of the mask. What they did was they studied pictures, tried to match and map the features from pictures of the chip into their own design, and the only reason they did that was not for the purpose of learning or evaluating. They did it for the purpose of just copying. That's why the provision doesn't apply at all, because the purpose that's permitted, which is evaluating, learning and teaching. No. I don't. In the district court, you mean? Yeah. I mean, if that were true as a matter of law, you wouldn't have had a reverse engineering instruction given. I assume. I mean, if there was no evidence that they copied consistent with the purpose of 906, whichever one it is, 1, you wouldn't have given the instruction. I mean, Judge Ware wouldn't have given the instruction. There would have been no evidence to support the giving of a reverse engineering instruction. So apparently, he must have believed that there was some evidence that they copied it for the purpose of analyzing at least the concepts and techniques. Maybe I'm not communicating. Yeah. I understand. I understand. I don't think it's part of the frame of that issue for Judge Ware. I think the issue was just given in a jury instruction. Judge Ware did not make a finding one way or another and was not asked to on that issue. He's not appealing the giving of the instruction as error for having not does it for lack of an evidentiary support. Right. I'm saying that it was, to the extent there was any error, it is not prejudicial or harmful in any way because the only evidence was that they did this not for the purpose of evaluating or learning unprotectable elements. They did it to actually copy. So it doesn't fall within the provisions of 906 at all. Their purpose was not to evaluate or study. It was to copy. Yeah, but, okay. All right. I don't understand why that's a germane argument on appeal. Well, because I believe their argument is that there was error in the jury instruction and that error was harmful. Yes. And I'm saying that the evidence is to the contrary, that to the extent there was error in the phrasing of the instruction, it was not harmful because there is only evidence, undisputed in the record. Okay. Let me pose a different error to you just so I can understand what you're saying. It seems to me like what the judge did was to say, okay, reverse engineering is all right so long as it pertains to nonprotectable aspects of the mask work. You can't copy protectable parts of the mask work for any purpose, including studying it, let alone using it to make a better mousetrap. And I'm not sure that that's consistent with the statute, which, as I understand it, says, look, you can copy for the purpose of learning from it. Then you can apply your learning to produce an original mousetrap. Yes. So long as it's not identical. And if you've gone through the work and you've gone through all that exercise, it can be substantially similar, yet it's okay. Well, it's not just the work of having studied something. It's the work of having come up with your own design after having extracted the ideas and unprotectable elements. My point is that there is no evidence in the record to dispute what was presented at trial showing that their intent was not to study or extract unprotectable elements at all. Their intent from the beginning was to do what their expert called structure mapping, going to our chips and making sure that their structures are mapped exactly to ours. What's wrong with that under the reverse engineering concept? Because if it's protected layout features that you're copying, then you have not fallen in the statutory language that says you can only copy for the purpose of learning or evaluating. You can't copy for the purpose of copying. That interpretation would render the entire statute meaningless because everybody is going to look hard at a chip when they're copying it, and that interpretation would excuse wholesale copying as well as piecemeal copying, both of which, Congress said, should not be permitted under the Act. So under standard copyright principles of reverse engineering, which apply, the purpose of what you are doing in evaluating somebody's mask have to be to extract unprotectable elements, and they didn't do that at all. They copied one-to-one features. So the reverse engineering statute wouldn't apply at all because that was not the reverse engineering, they were copying. And the record on that is undisputed. Well, again, why was the instruction given, if that's true? Well, I understand that you may think that's in error, but no, I'm just saying if the record is undisputed, then it wouldn't have supported the giving of an instruction, so you would have prosse-appealed on that footing, wouldn't you? My argument is there is no harm in any instruction given by Judge Ware. Any further questions on either the mask work or the tort act? I apologize. Probably, though, the instruction is wrong. What? The instruction is wrong, though, is it not? I don't think so. Well, I think it read in the context, he gave a three- or four-page recitation of the reverse engineering process from beginning to end, including copying of somebody else's mask work to extract those elements. So in the context of the entire description he gave of the reverse engineering act, I don't think it is wrong. And to the extent you believe there is an error, I think it's not a problem here because there is no evidence that they intended to evaluate anything that was unprotected. One of the problems with the instruction, at least in my mind, is the fact that it follows exactly the pattern of the statute but inserts different words, the non-protectable concepts in both sections one and two of the instruction, which is identical with the statute except the statute doesn't say non-protectable. Well, under 906, we believe that the language used by Congress specifically means non-protectable. In fact, if you look at the legislative history, which we've cited to you, Congress said what we mean by this is all of the things that are unprotected under Section 902. That's specifically in the legislative history. So what Judge Weir did was to say I'm going to simplify this and I'm going to say what Congress said in the legislative history. What we intend here is you can copy things that are not protected. And that's all, huh? And you can't copy things that are protected. Well, if that's true, why isn't the organization of components unprotected?  And if you look at Ms. Schrader's comments, the comments of the Copyright Office to this Act, what she said was specifically it's the physical arrangement of these features on the chip that are protected. It doesn't protect functional organization. It doesn't protect circuit diagrams that aren't actually in the physical characteristics of the chip. So what Congress said was if it's physical, if it's actually in the chip, has a feature that you can look at and say, yes, that has a physical existence, that has exact geometric relationship with other features, that's part of the mask work and that's protected. But if we're talking about circuitry in a diagrammatic way that's not actually in the chip but actually just is a functional description, it's not protected. And we agree with that. We agree with that. We're not seeking protection for that. We're seeking protection for what the mask work layout designer actually did in placing things in the mask. That's all. And if you exclude that, you are stripping away protection that Congress intended to give because it's part of the mask. And, indeed, it's an important part of the mask. Any other questions? It just seems to me that your argument, at least here and probably there, was that the key was whether it was copied for teaching or substantially analyzing, not for copying for the purpose of putting it in something else. That's right. But the question of what you can copy, I have a hard time seeing how that really is a correct instruction. Well, I've stayed in our position. Yeah, I see it. I understand. Any other questions? Thank you. Thank you. Mr. Halvern, it's a little rough, Justice, since I don't have the actual count. I'd say you have two or three minutes for rebuttal. Do the best I can. Equalize it out. Thank you very much, Your Honor. Let me start with where we ended. With respect to the protectable issue, obviously, by saying it's protectable and then saying that the organization, by saying it has to be nonprotectable and by saying that the organization of the components is protectable, what the Court did was to take out of the statute the right it gives to copy the organization of components. So it's clear that that instruction is antagonistic to the clear language of the statute. Number one. Number two, with respect to the proposition that copyright law principles apply to reverse engineering, that is false. At page 30947 of the Congressional Record, the House Memorandum specifically states, similarly, the privilege created by this Act, such as the reverse engineering right, may not be restricted by reference to the narrower privileges that obtain under copyright. With respect to the debate about whether we did it for the purpose of copying only, the matter did, in fact, go to the jury. What they're really asking for, obviously, is a directed verdict on an issue that they did not move for a directed verdict on in the trial court for very good reason, and that's because we did exactly what the Act says you're supposed to do. We went down there. We analyzed that chip. We determined from it what its architecture was, the organization of its components, and then we did, with reference to that reverse engineering statute, exactly what the statute and the House report says that we can do. With respect to the transistor level going to the jury, the fact is that if you look at 778 of our ER, the court essentially took it away from the jury, because he pointed out that some of the witnesses that testified that, as you compare one layer with another, there are substantial differences. He said, that's okay. I'm telling you. Pardon? He didn't say you couldn't consider it. Well, he said, in other words, the CHIP Act protects the entire design layout of a mask where, of course, this is not, in our view of the world, part of the design layout of the mask work, and is not limited to the design level of transistors or other electrical devices. So he said that, notwithstanding that, if the electrical, the transistors are absolutely different, you win or you can win, and that's wrong. You, meaning them. Okay. And I think your time, even generously construed, has expired. Do you have any questions? No. Questions? I really think your time has expired. Thank you. We appreciate the argument from both counsel, and the matter just argued will be submitted. We'll stand and proceed. Thank you.
judges: Hug, Ferguson, Rymer